Case number 22248 Yeemy Guatemala-Pineda v. Jeffrey A. Rosen. All right, Mr. Wilmoth. Thank you. Good morning. May it please the court, Jonathan Wilmoth on behalf of the petitioner, Yeemy Michelle-Pineda, a Christian woman who fled El Salvador due to threats she received by the gangs who opposed her religious activities. On appeal, the issues have been narrowed to two items. One, whether the government of El Salvador is unable or unwilling to control the gangs. And second, whether it's reasonable for her to internally relocate within the country. This court has used two standards or ways of describing the standard for unable or unwilling to control. In cases such as Gatungu and Ngengwe, it really just looked at the facts of the case and said the government either is unable or unwilling to control or not. And in a case called Menjivar, it said that unable or unwilling means that the government is essentially completely helpless to control that group. More recently, in a case called Goloso v. Bar, this court said that to the extent those two standards differ, the unable or unwilling standard prevails. We believe that the facts that were presented to the court and to the Board of Immigration Appeals show that the government of El Salvador is unable or unwilling to control the gangs. The immigration judge and the board relied on some evidence that was submitted that shows the government of El Salvador instituted a plan. They called Plan Segura in about 2015 and 2016. And that plan and evidence we submitted at the third trial showed that it didn't have any effect. It didn't bear fruit. It was described as window dressing. And so when we look at a case like Batungu, in that case, the courts looked at the facts of the country of Kenya and said, where that country spent 10 years saying they were going to fight back against this group, the Mungiki, and maybe they arrested some people, but in general, their efforts were so minimal and were countered by evidence of corruption and by police actually working with that group, that the government of Kenya was deemed to be unable or unwilling to control them. Wasn't there evidence, though? I mean, I think you're overstating the case a little bit here. I understand there to be evidence that Plan Segura actually did reduce the murder rate in El Salvador. Am I misreading the record, even if it didn't deal with some of these other problems? Yeah. So there was a reduction in murder rate for a short period. But we submitted evidence in 2017 and 2018 that shows not only did the murder rate go back up, but that Plan Segura made things worse in the administrative record at page 960, and that the police themselves were infiltrated by the gangs, which is a similar thing to what the court was looking at in Batungu. And Batungu was saying, hey, this group, the Mungiki, had ties to the police. So they would say, yeah, we'll arrest the couple. But in reality, the government wasn't controlling them because on either a local or national level, the police or politicians were using them, which is something we also submitted here, evidence that the government itself had used the gangs for their own political purposes. One party would use the gang to try to increase or connection between the government and the gang shows that it's very similar to what was going on in Batungu. And that's why we believe that just on a purely factual basis, looking at the evidence that was before the board, that the government of El Salvador was in the same way that the government of Kenya was in Batungu, was unable or unwilling to control them. I was just going to ask, what was the charge in the remand before the last trial? What was it that trial was supposed to focus on? Just those two issues. The board remanded on those same two issues twice. Judge Baker looked at that second remand and said, well, they're telling me that internal relocation is met, that by remanding it twice, they're saying, hey, we think that she can internally relocate. And his opinion, the third IJ opinion, really doesn't say much about it except to cite to the board remanding it again. I'm sorry, I think there was one other question. Judge, I was wondering why a reasonable fact finder couldn't find that your client could relocate. Bearing in mind that we have a standard of review here that's difficult for you. I'm aware, Your Honor. But that's it. The internal relocation, I think, what the facts were, was that for about two to three months, she said from March to about May, that she was traveling to the Capitol by bus. It was some distance. And she was traveling to the bus three to five days a week to work. And then she would come back. So she didn't live there. And she wasn't continuing her religious activities during that short window. She had decided to leave and was trying to raise the funds to leave. And so during that window, she wasn't engaging in her religious activities. And she wasn't living in this other place. And even still, she encountered problems with various criminal actors. But what I think it really comes down to is the expert opinion and the evidence shows that this gang she was afraid of, this nationwide. And the unrefuted testimony of the expert witness was that this local group is connected to the national group in a very small country. And so there really is no other place she could go to avoid that. And so what relevance is there? As I understand it, there was finding that I think it was the board made this finding, but that the trouble she had on the bus had nothing to do with religious persecution. That might get back to your point that she was not engaged in religion at the time. But that could be a problem if that's the only evidence of harassment that we have or danger. If the requirement was that during those two months, she had to show that she was persecuted, then that might be right. And that is what the respondent has argued as well that, well, this harm that she's talking about isn't related. But that isn't what the regulations say. The regulations that were in place throughout the although recently amended. The original version of the regulations said, we look at a totality of the circumstances as whether or not it's reasonable for her to relocate. And there were a series of factors, including civil strife, cultural constraints. In this case, we've argued gender as well as the judicial infrastructure. Judge Davis, in her original first two opinions, talked or I think it was the second opinion specifically talked about the evidence we had submitted about the judicial infrastructure of El Salvador being one where she really couldn't get benefit if she sought protection. I'm sorry, Your Honor, I'm into my rebuttal time. I would like to answer your questions, though. So if you have one right now, I'd be happy to answer. I have one more, which is along these lines, there was, I think, pretty undisputed evidence that the family was getting harassed, Pineda's family, but that none of them had suffered any danger or harm. That potentially goes to both issues, both reasonable relocation or relocation and the ability to protect. What about that evidence as a reason to uphold what the board did? Yeah, they're not similarly situated. So both the sister who was attacked after Miss Pineda left and the mother who wrote multiple statements to the court, both of them talked about the gang coming back and looking for Yemi, or they called her Michelle, her middle name. But they themselves were not the ones going out doing this religious activity. The gang was after her because of what she was doing, because they view that religious activity she was engaged in as detrimental to them. Well, her mom wasn't doing it, her sister wasn't doing it. She was described as hyper-religious, as someone who was constantly in church, constantly going out and preaching about God. And that is what the gang was trying to overcome. And that was found by Judge Davis, and Judge Baker didn't overturn it, and the board didn't challenge it Ms. Freer? Good morning, Your Honors. May it please the court, Allison Freer for the Attorney General. In this case, as Mr. Wilmoth has identified, only two issues remain before this court, whether the record compels the conclusion that the Salvadoran government would be unable or unwilling to control the gangs upon Miss Pineda's return to the country, and whether she has demonstrated that she could not internally relocate. The record does not compel the conclusion, contrary to that of the agency, on both issues, and so the petition for review should be denied. Because both issues are independently dispositive, Mr. Wilmoth needs to prevail on both of them in order to grant the petition for review. First, with respect to unable or unwilling, El Salvador is certainly plagued by high levels of and has been for some time. However, as our brief points out, the Salvadoran government has undertaken recent concrete steps to address the violence, and they have borne fruit. Certainly gang violence remains a problem, but the situation is not as severe or as devastating as it was a decade ago when Miss Pineda left El Salvador. Miss Pineda did not report the and so we're all relying on country conditions evidence to know what would have happened to her, making this case very similar to Gayoso, in which a Mexican domestic violence survivor presented evidence that nearly 70% of domestic violence claims are not investigated in Mexico, and this court found that nevertheless the record didn't compel the conclusion that the Mexican government would be unable or unwilling to protect that petitioner upon return. Similarly here, the generalized country conditions evidence shows that gang violence remains a problem, yet the Salvadoran government is taking significant steps to combat it, often with American help. Finally, I mean next, with respect to internal relocation, Miss Pineda bears the burden of demonstrating that she could not relocate or that relocation would be unreasonable. It's usually in these cases it's DHS that bears the burden of demonstrating that relocation is possible or that relocation is unreasonable, but that's only the case where the petitioner has demonstrated past persecution, and there's no dispute here that Miss Pineda has shown past persecution. So she bears the burden, and the agency reasonably found that she didn't meet it on this record. She lived in the same town the entire time that she was in El Salvador, but she worked in San Salvador for a few months and experienced no problems related to her religion. She didn't proselytize in the streets, but she was speaking to her co-workers about God, she testified, and she didn't experience any threats from related to that at all. She was the victim of some random thefts that seemed to be motivated simply by criminality, but those threats, I mean those thefts, didn't rise to the level of persecution. Mr. Wilmoth is correct. He does not need to show that the other serious harm she fears would be on account of a protected ground, but he does need to show that they rose to the level of past persecution, and the board was correct in saying that that was not the case here. Therefore, this court's precedent in Hagi Salad and the board's precedent in MCMR are not truly applicable because in those cases, the agency either assumed or found past persecution, which was not the case here. Well, counsel, it seems the evidence that she put on, the testimony of Borman regarding how things are still in El Salvador, the size of the nation, the size of Massachusetts, I think, was the testimony. It's not a large country that one could simply disappear in, and the extent of the gang activity is still quite high. I'm a little troubled by the ease with which the testimony of the petitioner's expert and the factual testimony put forth was relatively easily discounted by the government's position that, well, she worked three months in a different town, and that's sufficient. It's true that the petitioner's expert testified that she would not be safe anywhere else, but we know that she was, so he was testifying more generally, that in his experience, he didn't believe she would be safe anywhere else, but she was safe in San Salvador when she was working there. During the commute, she suffered thefts the same as everyone else on the bus. They weren't looking for her specifically. She was experiencing the same thefts that happened to her. She was safe. And so, while the record might support two different conclusions, that's exactly why it can't compel a conclusion that the agency was wrong. And Ms. Pineda testified that she was not practicing the evangelicalism in the sense that she was not going door to door in San Salvador, but she's never argued that she was forced into hiding or something like that in San Salvador. She simply chose not to do it. She didn't explain why. So, while she was there, she was able to work. She was able to move around. She went out. And so, it's true that the gang problem remains prevalent in El Salvador, but that doesn't compel the conclusion that the Salvadoran government would be unable or unwilling to control the gangs, particularly in light of their multiple rounds of attempts to control the decreased murder rate. Between 2015 and 2016, it went down by 20%. Still higher than anybody would like, I'm sure, but there have been significant concrete efforts that have borne fruit that make it so Ms. Pineda can't meet the high burden that she bears. If there are no more questions, I will waive the remainder of my time. All right. Mr. Wilmoth, I believe we exhausted your time with a few questions, so I'll give you about a half a minute to wrap up with any closing thoughts you have. Well, Your Honors, the disconnect here is this time that she was working in San Salvador. She was not safe in that this was a long-term prospect. The evidence we submitted and cited in our briefs shows that San Salvador was also inundated by the gangs. The efforts have not borne fruit. This is exactly like the court found in Gatungu, where the reform efforts by the government of El Salvador were, as we've described in our briefs, window dressing. It just isn't true. They're corrupt, and the gangs operate with impunity, and the government of El Salvador just simply has refused through either collusion with the gangs or using them politically to control them. Therefore, we think that this court should take the step of finding the facts, should overturn the findings, both with unable or unwilling to control and internal relocation. Thank you. Thank you, Mr. Willmuth. Thank you also, Mr. Frayer. We appreciate both counsel's argument that you provided to the court today, and we will continue to study the briefing and render a decision in due course. Thank you. Madam Clerk, I believe that concludes our scheduled arguments for this morning. Is that correct? Yes, Your Honor, it does. All right. That being the case, and no additional business, the court will be in recess until tomorrow morning at 9 a.m.